IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-02666-DME-CBS

VIDSTONE, LLC d/b/a ATSHORE SERVICES,

    Plaintiff,

v.

CARNIVAL CORPORATION,

    Defendant.

**FINAL ORDER**

    This case arises out of a billing dispute between Atshore Services (Atshore) and Carnival Corporation (Carnival). Carnival is a prominent international cruise line that retained Atshore to assist with coordination of medical services for ship employees and one passenger. Atshore is a small company that provides concierge-type services to cruise lines seeking to provide medical care for their employees at a first-class facility called Hospital Bendana in San Pedro Sula, Honduras. For almost a year, Carnival paid Atshore's invoices in full, but then it began withholding payment on the ground that Atshore's supporting documentation was inadequate. Nevertheless, Carnival continued to request Atshore's services, including on one occasion asking Atshore to coordinate the emergency medical treatment of an injured passenger. Atshore provided those services, but there remains an outstanding balance on some of Atshore's invoices.

Atshore now brings this lawsuit to recover on a contract for Carnival's employees, as well as a contract for the injured passenger. After a three-day bench trial, the Court determines the following:

1. There existed a contract wherein Atshore would charge Carnival for Hospital Bendana's charges, as well as other direct expenses incurred by Atshore in coordinating the medical treatment;
2. Under the contract to assist Carnival's employees, Carnival's outstanding balance is measured by the cost of medical care at Hospital Bendana, offset by excess payments already rendered on the disputed accounts, so it owes an outstanding balance of $ 19,342.40.
3. Under the agreement to assist Carnival's injured passenger, Carnival owes an outstanding balance of $ 61,588.90

## I.  FACTUAL BACKGROUND

### A. Agreement to Coordinate Healthcare Services for Carnival Employees

Carnival finances and coordinates the medical treatment of its own ship employees. Most of these employees, however, are not U.S. nationals. That means sending these employees to the United States for medical treatment would necessarily require getting approval from U.S. immigration authorities, which often proved to be unpredictable or unworkable. Moreover, the cost of healthcare in the United States is more expensive than the cost of the same care in other countries, in part because of U.S. providers' costly malpractice insurance which gets passed on to healthcare consumers. For these reasons, Dr. John Bradberry, Carnival's medical director, was

interested in alternatives to sending Carnival's employees to the United States for treatment.

Along came Sergio Aguirre, director and principal member of Atshore Services. Dr. Bradberry met Aguirre sometime in 2010 and learned that Aguirre's family operated a first-class medical facility called Hospital Bendaña in San Pedro Sula, Honduras. This was an appealing opportunity for Carnival because, instead of sending its employees to Miami, Florida or Houston, Texas for medical treatment, it could save money on lower-cost care at Hospital Bendaña and could avoid the difficulties of American immigration rules.

On March 8, 2011, Dr. Bradberry sent an e-mail outlining what Carnival was looking for in a potential arrangement with Atshore. The e-mail provided:

> What would be of potential interest to *us is a comprehensive cost saving package* that includes local transportation service such as airport pick up, budget rate lodging for when the crew members are not an impatient [sic], meals for both when in patient [sic] and outpatient and assistance with immigration issues. . . . Our new approach is to streamline by preferably using a *hospital affiliated billing service* that submits to us one itemized comprehensive invoice per month whether one crew member or ten crew members were treated that month and that includes incidental charges such as lodging and ot [sic] of hospital meals. We would in turn issue one check to the billing service to cover all charges that were reviewed and approved from our end.

Pl. Ex. 11_1 (emphasis added). Both parties understood from this emerging arrangement that Atshore would, in addition to the actual medical care of Carnival's employees, coordinate related services designed to facilitate the patient's treatment while in Honduras, e.g., assist with travel arrangements and visa requirements,

3

coordinate any air ambulance to the hospital if necessary, language translation services, etc.

But the parties were not on the same page with regard to other details of the arrangement. Based on Aguirre's representations, Dr. Bradberry believed that Aguirre and Hospital Bendaña were a "unified joint operation," and that the two were "synonymous" with each other. In fact, that was essential to Dr. Bradberry's willingness to deal with Atshore, testifying that he would not have entered the arrangement with Atshore if it were some "anonymous third party administrator." Moreover, Atshore continued to represent that it was synonymous with Hospital Bendaña throughout its business dealings with Carnival. For example, on one occasion, Aguirre referred to Hospital Bendaña as "our facility," Pl. Ex. 17_4, and in another instance he stated that "we always are open for treating your patients!" Pl. Ex. 17_11. Moreover, Atshore's invoices sent to Carnival throughout the relationship confirmed Dr. Bradberry's initial impression. Each of Atshore's invoices resembled actual hospital bills, itemized for different medical services or costs, and were not accompanied by any separate underlying invoices from Hospital Bendaña itself.[1] Because Carnival received only the Atshore invoices, with no underlying bills from Hospital Bendaña, Carnival assumed that Atshore's invoices merely passed along the Hospital's charges with no price adjustment.

---

[1] The evidence does not clearly establish precisely which documents accompanied Atshore's invoices when sent to Carnival. The invoice summaries themselves—which were clearly sent to Carnival—do not contain any reference to Hospital Bendaña. But the exhibits in evidence also contain spreadsheets with Hospital Bendaña's name at the top. These spreadsheets list the services provided to a particular patient, but omit the cost of each service.

4

While Aguirre was connected to the Hospital by way of his family relationships, the reality was quite different from what Carnival understood. Rather than operate as the hospital's billing service, Atshore paid Hospital Bendaña up front for all medical services rendered to Carnival employees, and then turned around and charged Carnival for those expenses, plus a substantial premium to cover Atshore's overhead and direct expenses. At no time did Carnival know that this was how Atshore was running its operation.

Because Carnival believed that Atshore was merely a hospital-affiliated billing entity that performed related coordinating services to facilitate medical care at Hospital Bendaña, Carnival expected that Atshore's invoices reflected the *actual* cost of medical care and other direct expenses. In Carnival's mind, Atshore would either be compensated by the Hospital because it was a unified operation with the Hospital, or it was recovering a profit on the margin between the actual cost billed to Carnival and a discounted rate charged by the Hospital to Atshore because of the volume that Atshore was bringing to the Hospital.

Atshore, on the other hand, operated under a fundamentally different assumption about how it would bill for services. Atshore assumed that the parameters of its agreement with Carnival enabled it to charge Carnival any amount that was reasonable and substantially cheaper than the cost of care in Miami. Throughout the relationship Aguirre maintained internally a master list of services, pharmaceuticals, and medical devices provided by Hospital Bendaña with a price he would charge Carnival for each item. When Hospital Benaña provided him a spreadsheet of services rendered for a particular Carnival patient, Aguirre would plug those items into his master list and

5

generate his own charge, which he would then bill to Carnival. In general, this fee was substantially higher than the actual cost charged by the Hospital to Atshore, but the markup was designed to cover Atshore's own overhead expenses along with other direct expenses for coordination services, with an additional surplus to ensure an overall profit margin. Under this model, Atshore generally did not itemize its direct expenses in the invoices sent to Carnival, but rather attempted to cover those expenses by inflating the medical charges from Hospital Bendaña.

For almost a year, Atshore billed Carnival under this model and received payment in full on each invoice. Each time a Carnival employee needed treatment at Hospital Bendaña, Carnival would send an authorization letter to Atshore requesting its services. On almost all of these letters, Carnival directed Atshore to provide all medical reports to ensure that Carnival had a complete medical file for each treated employee, and to "forward all medical bills with supporting receipts" to Carnival. Pl. Ex. 15_1-3, 6-11, 12-13, 16-18. When Carnival concluded that Atshore was not sending complete records of medical reports, it began only partially paying on some invoices, and denying all payment on others.

Atshore has now brought a breach-of-contract claim against Carnival to compel payment of the outstanding balances for twenty-one Carnival employees and one Carnival passenger, discussed next.

### B. Agreement to Coordinate Emergency Medical Services for Carnival Passenger Miti-Rojas

On July 3, 2014, a Carnival passenger named Rigo Gabriel Miti-Rojas suffered a severe head injury while in the island of Roatan, just off the coast of Honduras. Miti-

6

Rojas had purchased Carnival's travel insurance, which was administered by a company called On Call International (OCI). In Dr. Bradberry's view, OCI had unnecessarily delayed transporting Miti-Rojas off the island to a more advanced medical facility. Lacking confidence in OCI's ability to save Miti-Rojas's life, Dr. Bradberry intervened and asked Atshore to arrange for emergency transportation to Hospital Bendaña for initial stabilization efforts, expecting that OCI would thereafter transport Miti-Rojas to Miami for treatment at a more sophisticated trauma center. Dr. Bradberry's e-mail to Atshore specifically stated:

> Please launch an air ambulance with trauma surgeon and emergency nurse from Hospital Bendana ASAP to tend to the major trauma Carnival guest patient at the public hospital in Roatan and to transport patient from the public hospital to Hospital Bendana as soon as patient is stable. . . . Since without the above intervention from Bendana the patient has a low chance of survival, *[Carnival] will gurantee payment* beyond what the Carnival travel insurance covers *for the aired evac transport and initial evaluation and treatment at Hospital Bendana.*

Pl. Ex. 19_1 (emphasis added). Little did Atshore know that Dr. Bradberry's actual authority to make contracts on behalf of Carnival was limited to $ 25,000. However, that fact was never communicated to Atshore and was not otherwise accessible to the public. Without such knowledge of Dr. Bradberry's limitation on authority, Atshore responded affirmatively to Dr. Bradberry's e-mail and went about arranging for an emergency medevac to Hospital Bendaña.

When Miti-Rojas arrived at Hospital Bendaña, the on-site neurosurgeon determined that he was not stable enough to travel to Miami. However, on July 5, 2014, Dr. Bradberry e-mailed Atshore with the following statement:

7

"We now have passed the threshold of providing the initial life saving stabilizing intervention. Carnival will not be financially responsible for the patients [sic] ongoing care." Pl. Ex. 19_9. But it appears that, at least in the opinion of the OCI physicians, Miti-Rojas never stabilized while at Hospital Bendaña, making him unfit to travel to Miami. Miti-Rojas died on July 7, 2014 due to his brain injuries.

Atshore now claims that Carnival owes for unpaid coordination services and the medical care rendered to Miti-Rojas at Hospital Bendaña.

## II. DISCUSSION

The parties agree that Florida law governs this case. The following analysis addresses separately the claim for outstanding employee accounts and the claim for services connected to the Miti-Rojas incident.

### A. <u>Employee Care Claims</u>

#### 1. *Existence of a Contract*

An implied-in-fact contract is an agreement inferred from the parties' conduct, rather than their express words. See, e.g., Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., 695 So. 2d 383, 385 (Fla. Dist. Ct. App. 1997). The Court looks to the course of dealing and course of performance between the parties to decide whether the parties came to an agreement. See, e.g., McMillan v. Shively, 23 So. 3d 830, 831 (Fla. Dist. Ct. App. 2009) (citation omitted). In this case, the Court finds that there existed a contract implied in fact between Atshore and Carnival with regard to the coordination of treatment for Carnival's employees at Hospital Bendaña. While the parties operated

under different understandings of the contract's terms, *both* parties acted as if governed by the contract and *neither* party asks this Court to find the absence of a contract.

To be sure, a contract requires mutual assent between the parties. See 11 Fla. Jur. 2d Contracts § 19 (citing cases). But mutual assent depends on the objective representations made by the parties, rather than their subjective understandings. See id. § 22 (citing cases); see also 1 Williston on Contracts § 3:4 (4th ed.) ("Whether there is mutual assent to the terms of a contract is determined by an objective test, rather than the subjective intentions of the parties." (citing cases)). Accordingly, one party's unilateral misunderstanding of the terms of the contract is not sufficient to defeat mutual assent.[2] In this case, Carnival and Atshore objectively manifested agreement to the terms expressed in Dr. Bradberry's initial March 8, 2016 e-mail, so any subjective understanding to the contrary does not defeat mutual assent. Therefore, a contract existed.

### 2. *The Terms of the Contract*

The parties advance very different interpretations of the contract. The Court adopts the interpretation most consistent with the objective manifestation of the parties.

Atshore's position is that the contract entitled it to charge *any* price that was reasonable and lower than Miami healthcare prices. After all, the Hospital Bendaña

---

[2] Mutual assent is defeated by subjective misunderstanding between the parties only when "*neither* party . . . has reason to know the meaning attached by the other[,] *or* . . . *each* party . . . has reason to know the meaning attached by the other." Restatement (Second) of Contracts § 20 (1981) (emphasis added). In this case, Atshore had reason to know that Carnival believed the invoiced expenses accurately reflected the actual cost of the direct expenses—meanwhile Carnival could not have reasonably known that Atshore believed it was entitled to charge whatever it wanted for medical services so long as the amount was reasonable and cheaper than Miami prices, regardless of the actual cost of care.

opportunity appealed to Dr. Bradberry, in part, because he believed that the cost of care in Honduras would be substantially lower than the same care rendered in Miami. Moreover, Carnival knew that Atshore was performing coordination services, but those services were not itemized on Atshore's invoices and yet Carnival paid the invoices without question for almost a year. According to Atshore, that course of conduct indicates a bilateral understanding that Atshore would bill for its services by inflating the actual cost of medical care charged by Hospital Bendaña, rather than separately itemizing the cost of his coordinating efforts. And further, Atshore contends that Carnival should have known that the charges were higher than the cost of the care because Atshore was entitled to make a profit, which would be impossible if it were merely passing along the unadjusted hospital bills.

But Atshore's theory is objectively untenable. Nothing in the parties' course of dealing gave the impression that Carnival wanted Atshore to charge for its own expenses by artificially inflating the Hospital's charges for medical care without disclosing any add-on to cover Atshore's charges—in fact Dr. Bradberry expressly stated that Carnival wanted an "itemized comprehensive invoice . . . that includes incidental charges such as lodging and . . . hospital meals." Pl. Ex. 11_1. This language indicates that Carnival expected any direct expenses to be separately itemized, which renders Atshore's theory of the contract to be objectively unreasonable.

Carnival's position is better supported by the parties' expressions and conduct. In Carnival's view, it contracted to pay for the actual cost of medical care at Hospital Bendaña, plus any direct expenses incurred by Atshore in coordinating that care. Dr. Bradberry told Atshore at the outset that Carnival wanted a "hospital affiliated billing

service," which reasonably means that Carnival wanted a service that *passes along* the bills of Hospital Bendaña.  Atshore then responded in a manner that apparently conformed with this invitation: Sergio Aguirre registered Atshore as a certified vendor with Carnival and proceeded to submit invoices that *resembled actual hospital bills*—with line items for specific medical services and fees.  Moreover, Atshore's invoices were not accompanied by the hospital's actual bills—and Carnival's authorization letters required medical coordinators to "forward all medical bills with supporting receipts"—so Carnival reasonably assumed that Atshore's invoices either *were* the Hospital's bills or at least an identical pass-through version of them.  Finally, Atshore consistently held itself out to be a unified operation with Hospital Bendaña, which confirmed Carnival's understanding that it was contracting with a "hospital affiliated billing service" rather than a third-party administrator that was inflating the Hospital's medical charges to cover its own costs.

But how did Carnival figure that Atshore would profit from this arrangement?  There are several possibilities.  Carnival could have reasonably concluded that Atshore was, as Aguirre consistently indicated, one and the same with the Hospital, which would make it unnecessary for Atshore to generate a profit independent from that of the Hospital.  Carnival might have alternatively determined that Atshore was somehow being compensated by the hospital for bringing in a high volume of patients from Carnival.  Or instead, as Dr. Bradberry testified at trial, because Aguirre was bringing volume to the Hospital, Carnival might have reasonably expected that he would be profiting off the margin between a discounted amount billed to him by the Hospital and the actual hospital rate he charged to Carnival.  In light of these possibilities, Carnival's

theory of the contract is not unreasonable on the ground that Atshore could not profit under the arrangement.

Accordingly, the Court finds that the terms of the contract were that Carnival agreed to pay for the actual cost of medical care and any direct expenses for Atshore's coordinating services.

### 3. *Outstanding Amount Owed*

The Court now turns to the outstanding amount owed on the parties' contract: direct expenses for Atshore's coordinating services and the actual cost of care at Hospital Bendaña. To begin, the Court is unable to award any amount for Atshore's direct services because of the woefully inadequate proof offered to substantiate the claimed damages. Under Florida law, the "reasonable certainty rule" precludes recovery "where the fact of damages and the extent of damages cannot be established with a reasonable degree of certainty." Saewitz v. Saewitz, 79 So. 3d 831, 833 (Fla. Dist. Ct. App. 2012) (internal quotation marks, citation omitted). "The amount of damages claimed need not be proven with exactitude, but it must not be based on speculation or guesswork." Id. at 834.

Atshore offers a summary exhibit tallying for each year its expenses for travel arrangements, translation services, secretarial assistance, immigration coordination, and international long-distance calls. Pl. Ex. 5_2. But Aguirre admitted at trial that there are no records in evidence that would permit the Court to calculate how much time Atshore actually spent on any particular Carnival employee. There is simply nothing in this case—other than the total yearly amount expended for each service category—that would allow the Court to determine what expenses were incurred in connection with a

particular patient, or what would have been a reasonable charge. Moreover, even the aggregate yearly totals are speculative, as Aguirre conceded that he "didn't actually go through and pull the individual records to come up with these line items" but rather "was just recollecting what it was" for a given year. These estimates are inadequate to show how much Atshore spent in direct expenses for each Carnival patient.

The Court now turns to the cost of medical care at Hospital Bendaña. The aggregate cost of care for the twenty-one disputed employee accounts was $ 275,516.56.[3] Carnival contends that, after accounting for its historic payments to Atshore on all employee accounts (including the undisputed accounts), Carnival has already overpaid the amount Atshore claims is outstanding in this lawsuit.

The Court will not reduce the amount Carnival owes Atshore by the amounts Carnival may have overpaid on undisputed employee accounts not at issue here. Carnival was required to plead any such overpayment as an affirmative defense under Fed. R. Civ. P. 8(c). See Jobin v. Arnot (In re M&L Business Mach. Co.), 178 B.R. 270, 271 (Bankr. D. Colo. 1995) (stating that "[s]etoff and recoupment can be raised as either an affirmative defense or a counterclaim"); see also F.D.I.C. v. Noel, 177 F.3d 911, 914 (10th Cir. 1999) (stating defendant pleaded setoff and recoupment as affirmative defenses); Charles Alan Wright, et al., Federal Practice & Procedure § 1271 (updated Apr. 2017). Having failed to plead overpayment on the undisputed accounts as an affirmative defense, Carnival waived a claim for a set-off based on the overpayments for

---

[3] This figure is derived from Pl. Ex. 5_3-15, which is a summary exhibit that itemizes the total amount charged by Hospital Bendaña for each of Carnival's patients.

those *undisputed* employee accounts. See Radio Corp. of Am. v. Radio Station KYFM, Inc., 424 F.2d 14, 17 (10th Cir. 1970).[4]

However, Carnival *may* credit any payments it has already made on the twenty-one disputed accounts which are the basis of this lawsuit. Carnival has already paid $ 256,174.16 on these disputed accounts.[5] Deducting that amount from the aggregate Hospital Bendaña charges for these disputed accounts, Carnival still owes $ 19,342.40 to Atshore on those accounts.[6]

B. Claim for Miti-Rojas

The Court now turns to Atshore's claim for breach of a separate contract involving one of Carnival's *passengers*, Miti-Rojas. After Miti-Rojas suffered a life-

---

[4] On the issue of overpayment of the undisputed accounts, the Court will not permit a retroactive amendment here based on Fed. R. Civ. P. 15(b). Rule 15(b)(2) allows for unpleaded issues tried *by consent* of the parties to be considered by the Court, but Atshore has consistently objected to the inclusion of the setoff defense as to the undisputed accounts. Rule 15(b)(1) permits the pleadings to be amended even over an opposing party's objection when doing so would "aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." But the inclusion of these overpayments on undisputed accounts does not aid in presenting the merits of the case before the Court, which involves only the disputed accounts. Moreover, Atshore has shown sufficient prejudice to prevent the amendment of the pleadings to include Carnival's setoff theory as to the undisputed accounts.

[5] This figure is derived from Pl. Ex. 2_1-2, which is a summary exhibit that itemizes the total amount paid and overdue for each invoice on each disputed account.

[6] Even if no contract existed between the parties due to a mutual misunderstanding of material terms, a theory of *quantum meruit* would result in the same measure of damages. Under that theory, a plaintiff is entitled to the fair and reasonable value of services rendered to the defendant. See, e.g., Moore v. Spanish River Land Co., 159 So. 673, 674 (Fla. 1935). As with the contract theory, the damages for coordination services would be denied because of the inadequacy of proof. Moreover, because Carnival does not dispute the reasonableness of Hospital Bendaña's actual medical costs, then those costs would serve as the measure of damages owed to Atshore under a *quantum meruit* theory, less any overpayments on these disputed accounts.

14

threatening injury on the island of Roatan, Dr. Bradberry e-mailed Aguirre requesting that Atshore arrange for an emergency medevac to Hospital Bendaña. Dr. Bradberry assured Atshore that Carnival "will guarantee payment beyond what the Carnival travel insurance covers for the aired evac transport and *initial evaluation and treatment at Hospital Bendana*." Pl. Ex. 19_1 (emphasis added). As with the employee accounts, the Court finds that the parties contracted for Carnival to pay Atshore the actual cost of care at Hospital Bendaña in addition to coordination expenses, such as the air ambulance to the Hospital. Atshore has failed entirely to demonstrate the amount of its direct expenses or otherwise to show the reasonable value of its coordination services during the the Miti-Rojas incident, so the Court is unable to award contract damages for those services. However, the Hospital's invoice amount, paid by Atshore, has been adequately shown to be $ 71,588.90,[7] which Carnival has not yet paid.

Carnival has several defenses to payment, each of which fails. First, it contends that Dr. Bradberry lacked actual authority to bind Carnival to a contract exceeding the value of $ 25,000. That may be true, but the evidence supports a finding that Dr. Bradberry exercised *apparent* authority—e.g., Carnival gave the impression that Dr. Bradberry could bind the company to contracts in excess of $ 25,000. See, e.g., Taco Bell of Cal. V. Zappone, 324 So.2d 121, 123-24 (Fla. Dist. Ct. App. 1975) (Apparent authority "arises where a principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it."). At the outset, Dr. Bradberry's title as "medical director" would

---

[7] This figure appears on Pl. Ex. 5_13, which is a summary exhibit list that itemizes the total amount charged by Hospital Bendaña for each of Carnival's patients.

suggest that he could make high-level decisions on behalf of Carnival for the company's passengers. Further, Carnival approved Atshore's invoices exceeding $ 25,000 for employees over the course of the relationship, knowing that such invoices were sent pursuant to Dr. Bradberry's initiation of the relationship and along the terms established by Dr. Bradberry. Accordingly, the Court concludes that Dr. Bradberry exercised apparent authority.

Second, Carnival argues that the scope of its guarantee of payment was temporally limited to only the initial treatment period for Miti-Rojas. Not only did Dr. Bradberry's e-mail expressly state that Carnival would pay for the "initial evaluation and treatment," Pl. Ex. 19_1, but on July 5, 2014, he sent a follow-up message stating: "We now have passed the threshold of providing the initial life saving stabilizing intervention. Carnival will not be financially responsible for the patients [sic] ongoing care." Pl. Ex. 19_9. Carnival argues it owes, at the very most, the cost of care up until that e-mail was sent on July 5, 2014.

Carnival agreed to pay for the "initial" treatment. That word necessarily limits the scope of Carnival's payment guarantee—it means that after the "initial" treatment, Carnival's payment obligation would end. But when does "initial" treatment cease and ongoing treatment commence? Context suggests an answer. The parties understood that Miti-Rojas's stay at Hospital Bendaña would be temporary—just long enough to get Miti-Rojas medically fit for transportation to a more advanced trauma center in Miami. In other words, he had to be stabilized for the purpose of air transport to the United States. That is confirmed by Dr. Bradberry's follow-up e-mail where he states, "We now

16

have passed the threshold of providing *the initial life saving stabilizing intervention*." Pl. Ex. 19_9 (emphasis added).

But the problem is that, contrary to Dr. Bradberry's mistaken assumption, Miti-Rojas never became stabilized—he never passed the point of "initial evaluation and treatment" as that term was understood by the parties. Carnival agreed to guarantee payment for the cost of care all the way through the "initial" treatment and Atshore accepted the Miti-Rojas contract on that understanding. Carnival cannot rely on its own mistake of fact to cut off its obligation prematurely; that would be tantamount to a unilateral modification of the contract. Accordingly, this Court rejects Carnival's theory that its obligation of payment ended on July 5, 2014, because Carnival agreed to guarantee payment through the period of stabilization and Miti-Rojas was never stabilized before he died on July 7, 2014.

Third, Carnival contends that Hospital Bendaña's charge list for Miti-Rojas indicates that some of the services were performed on July 8, 2014, the day *after* Miti-Rojas died, and Carnival should not be responsible for those charges. But Aguirre offered a plausible and credible explanation for the discrepancy: bad data entry by the hospital. Further, for Carnival's contention to be accurate—that the Hospital was charging for services not actually performed or performed on a cadaver—that would require that Hospital Bendaña itself be involved in a fraud for payment, but there is no indication of nefarious motive by the Hospital at all. More likely, the Hospital accidentally entered some services in the data sheet on the wrong date after the fact. Accordingly, Carnival is not relieved from paying those charges.

Finally, the evidence indicates that Atshore has already received $ 10,000 from Miti-Rojas's travel insurance, so Carnival's outstanding debt for Miti-Rojas should be deducted by that amount. That means Carnival owes $ 61,588.90 to Atshore in connection with the Miti-Rojas account.

### III. CONCLUSION

Carnival owes an outstanding $ 19,342.40 on the disputed employee accounts, and $ 61,588.90 on the Miti-Rojas account. The combined outstanding debt is $ 80,931.30. Judgment is therefore entered against Carnival in that amount.

Dated this  7th  day of   September  , 2017.

BY THE COURT:

*s/ David M. Ebel*

U. S. CIRCUIT COURT JUDGE
DISTRICT OF COLORADO